Opinion
 

 ELIA, J.
 

 Appellants sued the County of Monterey (County) for trespass and inverse condemnation, alleging that County was liable because County intentionally breached a levee and flooded appellants’ property.
 
 [1]
 
 County moved for summary judgment and the trial court granted the motion. The trial court concluded that appellants’ inverse condemnation claim was barred under the emergency exception to the just compensation requirement. The trial court also determined that appellants’ trespass claim was barred because of the immunity afforded County.
 

 On appeal, appellants argue that there are triable issues of fact regarding both the inverse condemnation and trespass claims. We conclude that triable issues exist with respect to the inverse condemnation claim but that there are no triable issues with respect to the trespass cause of action. Accordingly, we
 
 *782
 
 will reverse the trial court’s granting County’s motion for summary judgment and remand the matter for further proceedings consistent with this opinion.
 

 Facts and Procedural Background
 

 The Odello Coast Ranch (Ranch) is located directly south of the Carmel River. The boundaries of the Ranch extend east and west of State Route 1 (highway 1). Appellants are the owners and lessees of the Ranch; they have grown artichokes on the property since the 1920’s.
 

 Commercial and residential property is located north of the Carmel River. The primary commercial presence is a shopping complex known as “The Crossroads” while the primary residential presence is a Carmel neighborhood known as “Mission Fields.”
 

 The Ranch is protected from the Carmel River by the Odello Levee which borders the river’s south side. Part of the Odello Levee protects the eastern fields of the Ranch. The portion of the Odello Levee west of highway 1 protects land appellants lease from the state (the western fields).
 
 [2]
 
 The Mission Fields Levee, which is located on the river’s north side, protects the commercial and residential areas. The protection provided by the Mission Fields Levee is not as great as the protection provided by the Odello Levee because parts of the Odello Levee are higher than the Mission Fields Levee.
 

 In 1985, a County Board of Supervisors resolution recognized the existence of á flood hazard in the lower Carmel valley and endorsed the concept of a flood control project. In 1989, the Monterey County Flood Control and Water Conservation District developed the Lower Carmel River Flood Control Project. Among other things, the flood control project recommended that portions of the Odello Levee be lowered, that the western portion of the Odello Levee be removed, and suggested creating a “tie-back” levee east of highway 1. With respect to lowering parts of the Odello Levee, the project embraced the concept of a floodway, creating an area between the Odello Ranch and the Odello Levee for flood conveyance. The flood project was never implemented by County. According to one county official, the project was never implemented because County did not have sufficient resources.
 
 [3]
 

 
 *783
 
 In January 1995, the Carmel River overflowed its north bank and flooded Mission Fields. Appellants’ property was protected by the Odello Levee and therefore did not suffer serious damage during the January 1995 flooding.
 

 In March 1995, heavy rains again raised the threat of flooding. On March 10, 1995, County declared a state of emergency and decided, without appellants’ permission or prior warning to appellants, to breach the western portion of the Odello Levee. By breaching the levee, County hoped to compensate for the fact that parts of the Odello Levee were higher than the Mission Fields Levee, and therefore prevent flooding in the residential and commercial areas.
 

 When the western portion of the Odello Levee was breached, river water was sent rushing onto appellants’ property thereby flooding and creating a lake in appellants’ western field. The flooding resulted in damage and destruction of appellants’ artichoke crop and other property.
 

 At about noon on March 10, 1995, a County official, Ronald Lundquist, informed appellants that County also intended to cut a hole in the part of the Odello Levee located east of highway 1. Appellants responded by moving their transportable equipment from the eastern field to high ground on land owned by them. However, they did not have sufficient time to move any of their packaging inventory, packing machinery or other equipment from the packing shed on the field. Once County crews had bulldozed a gap in the eastern portion of the Odello Levee, water from the Carmel River rushed across the field and created what was, in effect, a second lake. The floodwater diverted onto the eastern field damaged or destroyed appellants’ artichoke crop, a packing shed, and farm worker residences located there.
 

 Appellants filed a claim pursuant to the California Tort Claims Act. That claim was denied. Appellants then filed suit against County, asserting causes of action for trespass and inverse condemnation.
 

 County moved for summary judgment, arguing that it was immune from liability. In support of its motion, County established that County had declared a state of emergency on March 10, 1995. In response to the motion, appellants claimed that the destruction of the Odello Levee did not occur in the context of a “true emergency.” According to appellants, County’s declaration of an emergency was simply a label used by the County to shield it from responsibility for its prior failure to take steps to protect the residential and commercial areas from flooding. Appellants alleged that County had a deliberate plan to shift the expense of a viable flood control plan to appellants. Appellants allege that after the January 1995 flooding, there was a public outcry over the inadequacy of the flood control north of the Carmel
 
 *784
 
 River. According to appellants, County nonetheless took no steps to implement its flood control plan because County had decided to breach the Odello Levee if there was an immediate threat of flooding.
 

 In support of their position, appellants submitted evidence of the 1985 board of supervisors resolution, as well as evidence of the 1989 flood control project, which called for lowering and removing portions of the Odello Levee. Appellants also submitted a February 1995 memorandum from Joe Madruga, the assistant general manager of the Monterey County Water Resources Agency. The memorandum set forth Madruga’s account of the January 1995 flooding, including his statement that during the January 1995 flooding, County officials “requested an assessment of the advisability of breaching the Odello levee to protect the commercial area . . . .” Madruga reported that it was ultimately determined that the January 1995 flooding did not require that the Odello Levee be breached.
 

 Appellants offered a February 1995 memorandum from the Monterey County Office of Emergency Services. The memorandum analyzed the January 1995 flooding. Included in the analysis was the recognition that officials had considered breaching the Odello Levee but had decided against such action because “to be effective, this action would have to be planned ahead of time and employed expeditiously.” The report recommended no action with respect to the Odello Levee, noting that “The permanent lowering of the Odello levees is under investigation by the Public Works Department and the Water Resources Agency.”
 

 In a report regarding a February 27, 1995, meeting of the Board of Directors of the Monterey County Water Resources Agency, it was noted that “For approximately $75,000 the County could lower a levee on the south bank and protect Mission Fields from flooding from a similar [to the January 1995], but not from a much larger, flood. . . .” As part of the discussion, it was recognized that “Action at this time may be considered as emergency action, with fewer permitting constraints to delay the start of work. However, time is quickly running out when we can defend such an emergency condition determination. We still have several necessary approvals to obtain.” Finally, the report noted that “Neither Public Works nor the Agency have a funding source for this work. Thus, it cannot be undertaken if FEMA funding is not available. The criteria for FEMA participation in hazard mitigation work, and the amount of such participation (75% FEMA, 25% County, for example), is not clear cut. The County will not have a determination of FEMA’s participation until a Damage Survey Report is prepared, which may take two weeks.”
 

 After considering the evidence, the trial court granted County’s summary judgment motion. Among other things, the trial court found that a local
 
 *785
 
 emergency was declared on March 10, 1995, and that County decided to breach the Odello Levee in response to the emergency to prevent flooding of the commercial and residential areas. The court determined that appellants could not state a cause of action for inverse condemnation because the case fell within the emergency exception to the just compensation requirement. The trial court also concluded that appellants’ trespass claim failed based upon the immunity afforded County pursuant to Government Code section 8655. Finally, the trial court found that County’s failure to timely develop its flood control project was not actionable and that there was no evidence that County deliberately delayed implementing its flood plan. The court also noted that the evidence demonstrated that County’s actions were taken in response to a “35-50 year event” which had a 2 percent chance of occurring.
 

 This appeal ensued.
 

 Standard of Review
 

 Summary judgment is granted when there are no triable issues as to any material facts and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) (2) When reviewing a trial court’s decision to grant summary judgment, we must identify the issues framed by the pleadings, and determine whether the moving party has established facts which negate the opposing party’s facts and justify a judgment in the moving party’s favor. When the moving party’s facts prima facie justify a judgment, we determine whether the opposing party has demonstrated the existence of a triable issue of material fact.
 
 (Turner
 
 v.
 
 Anheuser-Busch, Inc.
 
 (1994) 7 Cal.4th 1238, 1252-1253 [32 Cal.Rptr.2d 223, 876 P.2d 1022].)
 

 Discussion
 

 I.
 
 Inverse Condemnation
 

 Appellants argue that there are triable issues of fact regarding appellants’ cause of action for inverse condemnation. We agree.
 

 Article I, section 19 of the California Constitution provides: “Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner.” Under this provision, if private property is wrongfully damaged or destroyed by government action, then an inverse condemnation action may lie to establish the owner’s damages.
 
 (Holtz
 
 v.
 
 Superior Court
 
 (1970) 3 Cal.3d 296, 301-303 [90 CaLRptr. 345, 475 P.2d 441];
 
 Rose
 
 v.
 
 City ofCoalinga
 
 (1987) 190 Cal.App.3d 1627, 1631 [236 Cal.Rptr. 124].) The inverse condemnation action is based upon the constitutional provision. It is
 
 *786
 
 independent of any right to sue under traditional tort theories.
 
 (Albers
 
 v.
 
 County of Los Angeles
 
 (1965) 62 Cal.2d 250, 260 [42 Cal.Rptr. 89, 398 P.2d 129];
 
 Friedman
 
 v.
 
 City of Los Angeles
 
 (1975) 52 Cal.App.3d 317, 321 [125 Cal.Rptr. 93];
 
 Rose
 
 v.
 
 City of Coalinga, supra,
 
 190 Cal.App.3d 1627, 1631.)
 

 A.
 
 Legal Right
 

 There are two general exceptions to this rule of inverse condemnation liability.
 
 (Bunch
 
 v.
 
 Coachella Valley Water Dist.
 
 (1997) 15 Cal.4th 432, 446 [63 Cal.Rptr.2d 89, 935 P.2d 796].) The first exception evolved from the common law right to inflict damage.
 
 (Archer
 
 v.
 
 City of Los Angeles
 
 (1941) 19 Cal.2d 19, 23 [119 P.2d 1];
 
 Albers
 
 v.
 
 County of Los Angeles, supra,
 
 62 Cal.2d at p. 262.) This concept was usually employed to permit upper riparian landowners to defend themselves against the “common enemy” of floodwaters.
 
 (Archer
 
 v.
 
 City of Los Angeles, supra,
 
 19 Cal.2d at pp. 23-25;
 
 Bunch
 
 v.
 
 Coachella Valley Water Dist., supra,
 
 15 Cal.4th 432, 440.) Often referred to as the “common enemy” doctrine, the idea was that a landowner threatened by flooding was entitled to erect defensive barriers. Any injury to lower landowners that resulted from the increased discharge or velocity of water was deemed
 
 “damnum absque injuria.” (Belair
 
 v.
 
 Riverside County Flood Control Dist.
 
 (1989) 47 Cal.3d 550, 564 [253 Cal.Rptr. 693, 764 P.2d 1070].) Because such activity was privileged when performed by a private person, it was generally considered equally privileged when performed by a public entity.
 
 (Archery. City of Los Angeles, supra,
 
 19 Cal.2d 19, 24-25.)
 
 [4]
 

 This exception to inverse condemnation liability was eventually criticized by both courts and commentators. (See, e.g.,
 
 Keys
 
 v.
 
 Romley
 
 (1966) 64 Cal.2d 396, 401 [50 Cal.Rptr. 273, 412 P.2d 529]; Van Alystyne,
 
 Inverse Condemnation: Unintended Physical Damage
 
 (1969) 20 Hastings L.J. 431, 500-501.) As Van Alystyne reasoned, under the exception, “The constitutional promise of just compensation for property damage for public use thus yields to the overriding supremacy of an anomalous rule of private law.”
 
 (Id.
 
 at pp. 500-501.)
 

 In response to this criticism,
 
 Belair
 
 v.
 
 Riverside County Flood Control Dist., supra,
 
 47 Cal.3d 550 refined the parameters of the legal right/common
 
 *787
 
 enemy exception. In
 
 Belair,
 
 private property was damaged when a flood control levee failed. After analyzing the property owners’ inverse condemnation claim, the California Supreme Court held: “[W]here the public agency’s design, construction or maintenance of a flood control project is shown to have posed an unreasonable risk of harm to the plaintiffs, and such unreasonable design, construction or maintenance constituted a substantial cause of the damages, plaintiffs may recover regardless of the fact that the project’s purpose is to contain the ‘common enemy’ of floodwaters.”
 
 (Belair, supra, A1
 
 Cal.3d at p. 565.)
 
 Belair
 
 emphasized that the mere fact that a dam or levee failed is not sufficient to impose liability. “[W]hen a public flood control improvement fails to function as intended, and properties historically subject to flooding are damaged as a proximate result thereof, plaintiffs’ recovery in inverse condemnation requires proof that the failure was attributable to some unreasonable conduct on the part of the defendant public entities.”
 
 (Belair
 
 v.
 
 Riverside County Flood Control Dist., supra, A1
 
 Cal.3d 550, 567.)
 

 Locklin
 
 v.
 
 City of Lafayette
 
 (1994) 7 Cal.4th 327 [27 Cal.Rptr.2d 613, 867 P.2d 724] provided courts with guidelines for applying the reasonableness rule. Under
 
 Locklin,
 
 a landowner is responsible for his or her proportionate share of damage to neighboring property when the damage is caused by the landowner’s unreasonable acts. If the upstream owner is a public entity, the court must also examine the nature of the improvement or public work, the degree to which its value offsets the damage to the neighboring property, and all other relevant matters, including whether the usefulness of the possessor’s land use outweighs the risk of damage to the property.
 
 (Locklin, supra,
 
 7 Cal.4th at pp. 359-360; see also
 
 Bunch
 
 v.
 
 Coachella Valley Water Dist., supra,
 
 15 Cal.4th at p. 446.)
 

 Recently, in
 
 Bunch
 
 v.
 
 Coachella Valley Water Dist., supra,
 
 15 Cal.4th 432, the California Supreme Court held that
 
 Belair'
 
 s reasonableness rule, as endorsed and refined by Locklin’s balancing principles, applies when the public entities’ efforts to divert water from a potentially dangerous natural course fail and cause property damage during a severe storm.
 
 (Id.
 
 at p. 435.) In
 
 Bunch,
 
 the water district maintained dikes and levees that sought to channel water safely away from a potentially dangerous natural flow. The project failed, causing damage. According to the Supreme Court, the issue was “whether the system’s design, construction, and maintenance were reasonable. . . . If the public entity’s conduct is unreasonable and a substantial cause of damage, the entity is ‘liable only for the proportionate amount of damage caused by its actions.’ . . . This inverse condemnation rule invokes constitutional balancing principles and is not governed by tort concepts of fault or negligence. It requires a balancing of the public need for
 
 *788
 
 flood control against the gravity of harm caused by unnecessary damage to private property.”
 
 (Id.
 
 at p. 436.)
 

 In reaching its conclusion, the California Supreme Court noted, “Of course, if the government, by works it constructs on its own property or elsewhere, diverts or dams natural waters, thereby permanently submerging previously dry private land in order to provide benefits to the public at large, a compensable direct ‘taking’ of the submerged land may occur no matter how ‘reasonable’ the government’s conduct. Moreover, cases under the federal Constitution have held that a ‘taking’ may occur when a government dam or flood control project subjects certain previously dry lands to inundation that is less than permanent, but is frequent and inevitably recurring.” (15 Cal.4th at p. 436, fn. 1, italics omitted.)
 

 The above discussion illustrates the evolution of the legal right/common enemy exception to the just compensation requirement and demonstrates the California Supreme Court’s gradual adoption of balancing principles and a reasonableness analysis in setting the boundaries of the liability of public entities. It is noteworthy that these cases involve
 
 the failure
 
 of public works. In
 
 Archer
 
 v.
 
 City of Los Angeles, supra,
 
 19 Cal.2d 19, the public entities’ drainage improvements caused damage to plaintiffs’ property.
 
 Belair
 
 v.
 
 Riverside County Flood Control Dist., supra,
 
 47 Cal.3d 550, involved the unintended breach of a flood control levee. In
 
 Locklin
 
 v.
 
 City of Lafayette, supra,
 
 7 Cal.4th 327, the public entity’s alterations and improvements on upstream property caused damage to downstream property owners. Finally, in
 
 Bunch
 
 v.
 
 Coachella Valley Water Dist., supra,
 
 15 Cal.4th 432, the water district’s dikes and levees failed, causing damage.
 

 Because these cases involve the failure of public works, rather than the deliberate decision by a public entity to flood one property to save others, this line of cases does not directly control the result here. The principles discussed, however, are useful because they reflect the Supreme Court’s adoption of flexible principles in order to reach a result that is equitable, which recognizes the importance of public works projects, and which ensures that the public entity be liable only for the proportionate amount of damage caused by its actions.
 

 B.
 
 Emergency Exception
 

 The second exception to the just compensation requirement, and the exception directly implicated in this case, is based upon the proper exercise of the public entity’s police power.
 
 (Gray
 
 v.
 
 Reclamation District No. 1500
 
 (1917) 174 Cal. 622 [163 P. 1024];
 
 Holtz
 
 v.
 
 Superior Court, supra,
 
 3 Cal.3d
 
 *789
 
 at p. 304;
 
 Bunch
 
 v.
 
 Coachella Valley Water Dist., supra,
 
 15 Cal.4th at p. 440.) A specific application of this rule concerns emergency conditions, i.e., “when damage to private property is inflicted by government ‘under the pressure of public necessity and to avert impending peril.’ ”
 
 (Holtz
 
 v.
 
 Superior Court, supra,
 
 3 Cal.3d at p. 305, quoting
 
 House
 
 v.
 
 L. A. County Flood Control Dist.
 
 (1944) 25 Cal.2d 384, 391 [153 P.2d 950]; see also
 
 Customer Co.
 
 v.
 
 City of Sacramento
 
 (1995) 10 Cal.4th 368, 382 [41 Cal.Rptr.2d 658, 895 P.2d 900].)
 

 Courts have narrowly circumscribed the types of emergencies that will shield a public entity from inverse condemnation liability.
 
 (Holtz
 
 v.
 
 Superior Court, supra,
 
 3 Cal.3d at p. 305;
 
 Smith
 
 v.
 
 County of Los Angeles
 
 (1989) 214 Cal.App.3d 266, 286 [262 Cal.Rptr. 754].) “ ‘ “Instances of this character are the demolition of all or parts of buildings to prevent the spread of conflagration, or the destruction of diseased animals, or rotten fruit, or infected trees where life or health is jeopardized.” [Citations.]’ ”
 
 (Smith
 
 v.
 
 County of Los Angeles, supra,
 
 214 Cal.App.3d at p. 286, quoting
 
 House
 
 v.
 
 L. A. County Flood Control Dist., supra,
 
 25 Cal.2d at p. 391; see also
 
 Los Osos Valley Associates
 
 v.
 
 City of San Luis Obispo
 
 (1994) 30 Cal.App.4th 1670, 1679 [36 Cal.Rptr.2d 758].)
 

 The importance of tightly defining this exception was explained in
 
 House
 
 v.
 
 L. A. County Flood Control Dist., supra,
 
 25 Cal.2d 384, 388-389: “ ‘The state or its subdivisions may take or damage private property without compensation if such action is essential to safeguard public health, safety, or morals. [Citations.] In certain circumstances, however, the taking or damaging of private property for such a purpose is not prompted by so great a necessity as to be justified without proper compensation to the owner. [Citations.]’ . . . Thus there is recognized the incontestable proposition that the exercise of the police power, though an essential attribute of sovereignty for the public welfare and arbitrary in its nature,
 
 cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights as to the inviolateness of private
 
 property.” (Italics added, original italics omitted.)
 

 Cases in which courts have applied the emergency exception to the just compensation requirement include
 
 Teresi
 
 v.
 
 State of California
 
 (1986) 180 Cal.App.3d 239 [225 Cal.Rptr. 517]. In
 
 Teresi,
 
 this court held that the emergency exception prevented a landowner from recovering for damage to his crop resulting from the Mediterranean fruit fly eradication program.
 
 (Id.
 
 at p. 242; see also
 
 Farmers Ins. Exchange
 
 v.
 
 State of California
 
 (1985) 175 Cal.App.3d 494, 502 [221 Cal.Rptr. 225].) In so deciding, we emphasized that the plaintiff had not disputed the emergency nature of the Medfly
 
 *790
 
 eradication program.
 
 (Teresi
 
 v.
 
 State of California, supra,
 
 180 Cal.App.3d at p. 242.) Recently, in
 
 Customer Co.
 
 v.
 
 City of Sacramento, supra,
 
 10 Cal.4th 368, the California Supreme Court applied the emergency exception to deny a storeowner recovery for damage caused to the store as a result of police efforts to capture a criminal suspect hiding inside. In relying upon the emergency exception, the California Supreme Court specifically rejected a contention that the government was the cause of the emergency.
 
 (Id.
 
 at p. 385.) In addition, cases cited in
 
 Customer Co.
 
 highlight the distinctive and uncommon nature of the circumstances justifying application of the emergency exception. (See, e.g.,
 
 United States
 
 v.
 
 Caltex, Inc.
 
 (1952) 344 U.S. 149 [73 S.Ct. 200, 97 L.Ed. 157] [recovery denied for United States Army demolition of a Manila oil terminal facility that was destroyed immediately prior to Japanese Philippine Islands invasion]; see also
 
 United States
 
 v.
 
 Pacific Railroad
 
 (1887) 120 U.S. 227 [7 S.Ct. 490, 30 L.Ed. 634] [compensation denied for bridges destroyed by Union forces as Confederate army advanced].)
 

 Cases in which courts have held the emergency exception inapplicable reflect circumstances much less compelling than those presented by the cases discussed above. For example, in
 
 Rose
 
 v.
 
 City of Coalinga, supra,
 
 190 Cal.App.3d 1627, 1635, the Court of Appeal reversed a summary judgment due to a question of fact regarding whether a “true emergency” existed when the city waited 57 days after the Coalinga earthquake to demolish an allegedly unsafe building. In
 
 Smith
 
 v.
 
 County of Los Angeles, supra,
 
 214 Cal.App.3d 266, the Court of Appeal held that the County’s decision to remove debris from roads instead of closing them constituted a choice, rather than an emergency. In
 
 Los Osos Valley Associates
 
 v.
 
 City of San Luis Obispo, supra,
 
 30 Cal.App.4th 1670, a shopping mall owner brought an inverse condemnation action alleging that the city’s groundwater program caused subsidence which resulted in property damage. The Court of Appeal held that city’s action were not the result of an emergency and that the city was therefore liable in inverse condemnation.
 

 C.
 
 Analysis
 

 Having considered the applicable legal principles, we must now determine whether the emergency exception to the just compensation requirement shields County from liability. In particular, we must decide whether County is exempt because its action was taken in response to the immediate threat of flooding that existed on March 10, 1995. In making our determination, we must consider whether our conclusion should be affected by County’s 1989 flood plan which required lowering and removing parts of the Odello Levee to reduce the risk of flooding in the residential and
 
 *791
 
 commercial areas. We must also decide whether our determination should be impacted by the fact that County considered breaching the Odello Levee both during the January 1995 flooding and in its immediate aftermath.
 

 County contends that these facts, regardless of whether they are disputed or undisputed, are unimportant. In essence, County argues the emergency exception is a “bright-line” rule that must be applied because it is undisputed that an emergency existed on March 10, 1995. Accordingly, County contends that it does not matter what County did or did not do prior to March 10, 1995, because on March 10, 1995, it was manifestly necessary to breach the Odello Levee.
 

 No case has considered this precise issue. Although
 
 Belair, Locklin,
 
 and
 
 Bunch
 
 involved the failure of public works, they did not involve a public entity’s deliberate decision to breach a levee. Nor did they involve an allegation that the public entity’s response to an emergency situation was necessitated by the inadequacy of a public work. Thus, this case represents a unique situation: County declared an emergency and decided to breach the Odello Levee due to the inadequacy of another public work—the Mission Fields Levee.
 

 We are certainly mindful of the danger of second-guessing the decisions of public entities regarding public works and emergency situations. On the other hand, we do not think that the public interests are served by simply ignoring County’s prior knowledge of the flood threat. Nor do we think it is either fair or reasonable to deny appellants compensation simply because County has established that it declared an emergency on March 10, 1995. This is especially true since it seems clear that if County had in fact chosen to implement its existing flood plan, and had condemned part of appellants’ property, then County would have been required to compensate appellants for the property taken. Accordingly, in this case, the determination regarding County’s liability cannot be based solely upon the situation which existed on March 10, 1995. The emergency action was necessary due to the inadequacy of the Mission Fields Levee, an inadequacy which was acknowledged by the County as early as 1989, and an inadequacy which had caused flooding during January 1995, just two months prior to County’s March 1995 “emergency” action. In such circumstances, the emergency exception should not shield County from liability for inverse condemnation because “ ‘the taking or damaging of private property ... is not prompted by so great a necessity
 
 as to be justified without proper compensation to the owner.
 
 [Citations.]’ ”
 
 (House
 
 v.
 
 L.A. County Flood Control Dist., supra,
 
 25 Cal.2d at p. 388, italics added, original italics omitted.) In fact, it would be antithetical to the principles of our Constitution to permit a public entity to burden private
 
 *792
 
 property simply because the public entity’s inadequate flood control measures threatened other, more populated property. If the emergency exception were applied in these circumstances, appellants would be required to contribute a disproportionate share of the public undertaking. Such a result would be neither fair nor just, regardless of County’s March 10, 1995, declaration of an emergency.
 

 Belair, Locklin,
 
 and
 
 Bunch
 
 embody policies that recognize that inverse condemnation recovery be equitable, that support the importance of public works projects, and that ensure that the public entity be liable only for the proportionate amount of damage caused by its actions. Our conclusion furthers these policies and also has the further laudable effect of encouraging public entities to engage in flood control efforts while discouraging them from making uncompensated use of private property.
 

 Finally, County has argued that it is not liable even if the facts alleged by appellants are undisputed. We have rejected the claim that County is automatically shielded from inverse condemnation liability. Accordingly, we shall conclude that the trial court erred in granting summary adjudication on the inverse condemnation claim.
 

 II. '
 
 Trespass
 

 Appellants contend the trial court erred in granting summary judgment on their trespass cause of action. We disagree.
 

 The California Tort Claims Act was intended to “[abolish] all common law or judicially declared forms of liability for public entities, except for such liability as may be required by the state or federal constitution, e.g., inverse condemnation. In the absence of a constitutional requirement, public entities may be held liable only if a statute (not including a charter provision, ordinance, or regulation) is found declaring them to be liable. . . . [T]he practical effect of this section is to eliminate any common law governmental liability for damages arising out of torts.” (Legis. committee com., Deering’s Ann. Gov. Code (1982 ed.) § 815, p. 134.) In addition, under subdivision (b) of section 815, the provisions granting immunity will generally prevail over all sections imposing liability.
 
 (Ibid.)
 

 Government Code section 820.2 provides: “Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.” Government Code section 820.2 confers immunity for basic policy decisions
 
 *793
 
 which have been committed to coordinate branches of government. It does not shield government entities from liability for ministerial decisions taken after the implementation of basic policy decisions.
 
 (Customer Co.
 
 v.
 
 City of Sacramento, supra,
 
 10 Cal.4th 368;
 
 Lopez
 
 v.
 
 Southern Cal. Rapid Transit Dist.
 
 (1985) 40 Cal.3d 780, 793 [221 Cal.Rptr. 840, 710 P.2d 907].) In deciding whether action is discretionary, the California Supreme Court has rejected a mechanical analysis but focused upon policy considerations behind the grant of the immunity. “Courts and commentators have . . . centered their attention on an assurance of judicial abstention in areas in which the responsibility for basic policy decisions has been committed to coordinate branches of government. Any wider judicial review, we believe, would place the court in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government.”
 
 (Johnson
 
 v.
 
 State of California
 
 (1968) 69 Cal.2d 782, 793 [73 Cal.Rptr. 240, 447 P.2d 352], italics omitted.)
 

 Unlike the inverse condemnation claim, which is based upon the Constitution and therefore not subject to the immunities set forth within Government Code section 820.2, appellants’ trespass cause of action is a tort claim. Section 820.2 is therefore potentially applicable. We will conclude that County’s decision with respect to its flood plan, as well as its decision to breach the Odello Levee in a particular manner, were plainly acts within County’s discretion. These decisions reflect policy choices for which the responsibility has been committed to a coordinate branch of the government rather than a determination at the “ministerial rung of official action.”.
 
 (Johnson
 
 v.
 
 State of California, supra, 69
 
 Cal.2d at pp. 795-796.) Thus, there can be no liability for trespass.
 
 [5]
 

 Disposition
 

 The trial court’s order granting County’s motion for summary judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. Costs on appeal to appellants.
 

 Premo, Acting P. J., and Wunderlich, J., concurred.
 

 A petition for a rehearing was denied May 26, 1998, and respondent’s petition for review by the Supreme Court was denied August 12, 1998.
 

 [1]
 

 Appellants are Odello Brothers, a California general partnership, Bruno Odello, Isabelle D. Odello, Bruna Odello, John B. Odello, Michael B. Odello, Carla O. Throgmorton, Claire A. Berry, and Pamela Noto.
 

 [2]
 

 The portion of the Ranch located west of highway 1 is owned by the State of California and leased from the state by appellants. The portion of the Ranch located east of highway 1 is owned outright by appellants.
 

 [3]
 

 In approximately 1990, County imposed a land use condition on appellants which would have allowed County to lower the Odello Levee if the Odello artichoke fields were ever developed into homesites. Appellants never developed the property but continued using it for agricultural purposes.
 

 [4]
 

 The common enemy doctrine, however, did not allow landowners to divert stream waters from their natural drainage across adjoining property.
 
 (Clement
 
 v.
 
 State Reclamation Board
 
 (1950) 35 Cal.2d 628, 637-638 [220 P.2d 897];
 
 Bunch
 
 v.
 
 Coachella Valley Water Dist., supra,
 
 15 Cal.4th at p. 440.) Thus, in
 
 Clement,
 
 waters contained by a levee that had been in existence for 60 years were considered natural stream waters that could not be diverted onto the lands of another. (35 Cal.2d at p. 636.) The court decided that the public entity was liable for inverse condemnation, regardless of the common enemy exception, if the public entity caused water to enter plaintiffs’ land that would not have entered except for the public entity’s action.
 

 [5]
 

 Because we find that appellants’ trespass claim is barred under Government Code section 820.2, we need not consider the applicability of section 8655, which concerns governmental emergencies.